CARTTER (WESTLAKE v.). See Case No. 17,451.

## Case No. 2,482.

CARTWELL et al. v. The JOHN TAYLOR.

[Newb. 341.] [1]

District Court, E. D. Louisiana. Nov., 1842.

SEAMEN'S WAGES—SHIPWRECK—SALVAGE BY CREW—BY OTHERS—COMPENSATION.

1. The crew of a wrecked vessel, who have by meritorious exertions saved the tackle, apparel and furniture of that vessel, have a claim for compensation in the nature of salvage upon the property so saved.

[See note at end of case.]

2. It is the general doctrine of the English maritime law, from which ours is derived, that the payment of wages is dependent upon the earning of freight. If no freight be earned, no wages are due, for freight is the mother of wages; but in cases of shipwreck where the seamen cannot earn wages and yet perform a meritorious service, they are entitled to a salvage compensation for their labor and services in preserving the wreck of the ship and cargo, or either.

[See Rev. St. § 4524, cited in note at end of case.]

3. Where salvage is allowed to seamen for services performed in preserving the wreck of their own vessel and her cargo, the amount of wages they were receiving at the time of the disaster, is a safe and proper criterion to be adopted by the court in fixing the quantum of salvage they are to receive.

4. Compensation in such a case allowed to seamen, must be paid out of the proceeds of the property saved.

5. In awarding a salvage compensation at the rate of fifty per cent., in accordance with the stipulations of a written contract between the United States consul at Havana of the one part, acting for the master, owners and underwriters of the wrecked ship, and the master of the schooner Warrior of the other part, in pursuance of which the said schooner came to the relief of the wrecked vessel, the court will not give the whole compensation to the master and owners and leave the seamen to look to the other moiety for their reward. The contract is not a rule that binds the court to grant so large a percentage on the value of the property saved to the master and owner only, as ostensible parties to the agreement, when it is shown that the dangers and toils incident to the enterprise, have been shared by the seamen, who were doubtless induced to embark in the undertaking by the very fact that such a contract was entered into by the master.

In admiralty.

Mr. Cohen, for libelant.

Mr. Moise, for the master and owner of the Warrior.

Mr. Schmidt, for intervener Grant.

[1] [Reported by John S. Newberry, Esq.]

McCALEB, District Judge. This is a libel in rem against the tackle, apparel, furniture, and a portion of the materials lately belonging to the ship John Taylor, which was wrecked near Cape Antonio, on the south coast of the island of Cuba, on the 18th of October last, while pursuing her voyage from Liverpool to the port of New Orleans. The original libel was filed by four of the crew of said ship, claiming a lien on the said tackle, apparel, etc., for the satisfaction of their wages, and also for additional compensation in the nature of salvage, for having saved the said tackle, apparel, &c., from the wreck of the said ship. Intervening libels were afterwards filed by twenty-one more of the crew of the wrecked vessel, claiming wages and compensation also in the nature of salvage, as set forth in the original libel. Then followed the intervening libel of Edward Griffith, master of the schooner Warrior, intervening for himself and for James Chapman, owner of said schooner, and William Saunders, mate, Joseph Lovell, John Noyes, John Robinson, Benjamin Mitchell and Charles H. Corbin, seamen on board said schooner, and Nicholas P. Trist, the American consul at the port of Havana. Lastly the libel of intervention of T. A. Grant was filed, claiming compensation in the nature of salvage for services in traveling by land across the island from Cape Antonio to the city of Havana for the purpose of procuring aid for the wrecked vessel, her crew and passengers.

I shall first consider the claim of the crew of the John Taylor. It has been most satisfactorily proved that they worked with energy and fidelity: that their services in saving the tackle, apparel, &c., of the wrecked vessel, were of the most meritorious character. The strictest subordination prevailed among them, and they manifested the most perfect willingness to do their duty, and displayed the utmost promptitude in executing the orders of the master. Through their aid, in conjunction with that of the officers and crew of the schooner Warrior, almost all the tackle, materials, &c., of the John Taylor were saved. The first question that arises is: Have they a right to claim wages for the services they had rendered, and if not, in what manner are they to be compensated? I have examined the authorities on this subject with the strictest care and attention, and although it must be admitted that the ablest admiralty tribunals have differed somewhat in opinion, I am inclined to think that the view taken by Mr. Justice Story in the case of The Two Catherines [Case No. 14,288], is not only sustained by the greatest weight of authority both in England and in this country, but presents the whole subject in a light which reason must at once adopt and the immutable principles of justice forever sanction. I shall quote his remarks at some length. "It is laid down as a general doctrine of the English maritime law, from which ours is derived, that the payment of wages is dependent upon the earning of freight. If no freight is earned in the voyage, no wages are due; for, in the expressive phraseology of the ancient law, freight is the mother of wages. Hence, if the ship be lost during the voyage, so that no freight is earned, the mariners lose their wages. And by parity of reason, if by inevitable accident the freight is partly lost, it seems that the seamen lose a proportion of their wages. The ground of this doctrine is said to be, that 'if the seamen should have their wages, in such cases they would not use their endeavors nor hazard their lives to save the ship.' Sid. 179. And the argument now is that the reason of the rule shows that it does not apply to a case of shipwreck like the present, where the whole freight is lost; for if the seamen are not entitled to wages for salvage from the wreck, they can have no motive to remain by and use their exertions to save it. And it is earnestly contended that all the cases in which it has been held that no wages are due to the seamen, are cases, not of shipwreck, but where the ship perished at sea, so that there was a total loss of ship and freight. It appears to me that upon the established doctrines of our law, where the freight is lost by inevitable accident, the seamen cannot recover wages, as such, from the ship owner. And it is perfectly immaterial in such cases whether the ship be lost or be in good safety. Nor does the case of shipwreck, strictly speaking, form an exception to the generality of this rule. It more properly introduces another principle, that of allowing salvage to the crew when they cannot earn wages and yet perform a meritorious service." After commenting at length upon the different opinions entertained by different authors, he thus proceeds: "But whatever may be the true doctrine on this subject in respect to wages, I am clear that upon principle, the seamen are entitled to salvage for their labor and services in preserving the wreck of the ship and cargo or either. It is a claim founded in natural justice and sustained by the most obvious motives of public policy and interest."

The opinion of Mr. Justice Story is but a re-assertion of the same doctrine maintained by Judge Peters in the case of Taylor v. The Cato [Case No. 13,786]. "The claim of the sailor," said he, "is not under his contract for wages out of freight; but in a new character as a salvor, he regains a rightful claim to wages, restored by rescuing the articles (whether parts of the ship or cargo) from the perils and loss to which the wreck had exposed them." The reasoning of these eminent judges I am inclined to adopt as my own rule of decision. The right which these seamen have to claim a reward, cannot be doubted; and it is immaterial whether this reward be granted as wages, or as salvage strictly so called, since the loss of wages consequent upon a loss of freight, is supplied by a compensation in the light of salvage for

their meritorious services in saving from the wreck the tackle and materials, upon which the law secures them a lien. Following the high precedents to which I have referred, I think it fair and equitable to take the amount of the wages[2] which these seamen were receiving as my guide in awarding the quantum of salvage, and shall therefore allow them a continuance of those wages on the homeward voyage, at the same rate per month, to the day when the tackle, furniture and materials were taken into custody by the marshal of this court.

And now, in regard to the party upon whom this charge is to fall, I should probably feel some doubt, were I not happily furnished with a precedent by which I can be satisfactorily guided, to be found in the decision of Judge Story in the case of The Two Catherines [Case No. 14,288]. "It is not," says he, "like the ordinary charge of seamen's wages, which are a charge upon the ship owner, and are to be borne by the freight; but it is in the saving of the materials of the ship for the benefit of those who are to receive it cum onere. The case of Frothingham v. Prince, 3 Mass. 563, is also directly in point." The charge, then, will be paid out of that portion of the proceeds of the property saved which may fall to the underwriters, to whom, as I have learned, the property has been abandoned. It is my next duty to consider the claim of the owner, master and crew of the schooner Warrior, which went from the port of Havana to the relief of the John Taylor. This she did under a special contract entered into by Capt. Griffith, her master, and N. P. Trist, the American consul at Havana, "acting for and on behalf of the master, owner and underwriters of the ship John Taylor." I have examined with attention the contract under which the salvage at the rate of fifty per cent. is claimed, as well as all the facts and circumstances under which the services were rendered; and I can see no good reason for changing the rule of decision adopted in the case of The Clarion [Case No. 2,795], decided in this court a few days since. As to the merit of the services rendered, there can be no doubt. The evidence shows that the Warrior remained near the wreck almost a month: that she was frequently in great danger, and was on one occasion compelled to slip her cables and put to sea, as her anchors dragged among the rocks and she ran the risk of being thrown ashore. During the time she remained near the wreck her crew were busily employed in transporting the salt from the John Taylor on board their own vessel, and in stripping the former of such parts of her as were sufficiently valuable to be saved. In a word, the Warrior and her crew did all that human agency could accomplish in affecting the object they had in view when they left the port of Ha-

vana. Yet, in awarding the very liberal salvage of fifty per cent. as stipulated in the contract, I know no principle either in law or equity which would justify the court in giving the whole amount to the master and owner, and compelling the crew to look to the other moiety for their share of the salvage. I cannot recognize the agreement as a rule that binds the court to grant so large a per centage on the value of the property saved to the ostensible parties to the agreement, when the dangers and toils incident to the enterprise have been shared in equally by others, who doubtless were induced cheerfully to embark in the undertaking in consequence of this very agreement. To the view of the master and owner of the Warrior it may be very proper thus to subject to a mere contingency the hopes of their gallant crew. But in the eye of the court, it becomes a matter of great importance to protect the rights of the latter as well as the former; and if a particular indulgence is to be extended to either side, the seamen should reap the benefit of that indulgence; and for the obvious reason, that they are not always possessed of the capacity to protect their own rights.

But the ingenious proctor for the master and owner, as well as of the crew of the Warrior, has contended that the latter do not seek to avail themselves of the written contract, but wish to assert their claim against the whole amount of property saved. This position is equally objectionable, since it directly interferes with the rights of another set of salvors, whose claims, though asserted upon a different principle, imperatively demand the protection of the court. And it is quite apparent that when these claims have been satisfied, there will be but a pittance remaining for the underwriters. With due respect for the zeal displayed in the argument of this case, the court would respectfully suggest, that however meritorious may be the services of salvors, there is such a thing as overstepping the bounds of reason and moderation in the demands which are usually made for compensation for those services. This was a case which peculiarly called for the exercise of disinterested heroism and self-devotion, a case in which the appeals in favor of humanity were loud and irresistible. Let us hope that in such a case the meritorious exertions and the deeds of gallantry, which in fact have not been magnified beyond the deserts of those who performed them, were prompted in some small degree by the influence of the golden precept. "Do unto others as you would have others do unto you;" and not solely by the instigations of avarice or rapacity. Let it not be said, that bold and hardy adventurers in the cause of human suffering, after accomplishing the meritorious object they had in view, now seek to swallow up all that was left by the mercy of the winds and the waves.

[2] [See note at end of case, citing Rev. St. § 4524.]

I proceed now to establish the mode of distribution, and leave the precise quantum of salvage allowed to be hereafter ascertained. The proceeds of the property saved from the wreck of the John Taylor amounts to $4,800; of this sum fifty per cent. is awarded to the owners, master and crew of the schooner Warrior, after deducting the costs of court and all expenses, and the two and a half per cent. due the consul in Havana. In allowing this last amount, I have deviated from the decision given in the case of The Clarion [supra]. In that case no proof was given of the right of the consul to make the charge. In the present case it was clearly shown. Besides, in the case of The Clarion, the amount allowed to the owners, master, &c., was sufficiently large to justify the course therein pursued. From the whole proceeds must be also deducted the $29 still due to Mr. Grant for traveling across the island to Havana. I award him no more, because it has been proved by the master of the John Taylor, that this sum, in addition to the $100 he has already received, is a fair compensation for his services; and because he was at one time willing to receive it as satisfaction in full. I see no good reason why he should have subsequently demanded a higher compensation, the opinion of the attorney whom he consulted, to the contrary notwithstanding. When these deductions shall have been made from the whole amount of the proceeds, fifty per cent. of the remainder is to be divided among the owner, master, mate, and five seamen in the following manner: To the owner I award one-third of the fifty per cent; and the other two-thirds I divide into sixteen shares of $100 each. Of these shares I award the captain or master seven shares, the mate four shares, and each seaman one share. From the other moiety must be deducted the sum of $161, the value of a small boat, a cable, and an anchor, which were lost by the master of the Warrior, and for which he shall be indemnified. The clerk will be furnished with an abstract of this decree, and ordered to pay over the money in accordance with the mode of distribution above prescribed, after the payment of the costs of court.

[NOTE. One of the earliest cases in this country to allow salvage to a seaman for services to his own ship was that of The Blaireau, 2 Cranch (6 U. S.) 240. There the master and other members of the crew deserted the vessel, leaving one seaman alone upon her. With the assistance of other salvors, she was brought into port. The court laid special stress upon the fact that, by abandoning the seaman to his fate, the captain had absolved him from further duty under his contract. In the later cases this idea is still more strongly emphasized, and the right of a seaman to salvage in his own vessel is made to depend upon whether, before rendering the services, his contract has been put an end to, either voluntarily by the master, or by vis major. Thus, in the case of The Triumph, Case No. 14,183, it is said: "The vital question is, had the contract with the seaman been dissolved? that is, was he bound to render the service for which he claims salvage compensation, or had he been previously discharged from all obligation under his contract?" The same principle is laid down by Judge Lowell in The Olive Branch, Id. 10,490. In that case the ship had stranded. The master was absent, and there was no mate. The crew, however, got the vessel off, with some difficulty and danger. Salvage was denied on the ground that the voyage was not ended, nor the contract in any way annulled or dissolved. See, also, The Antelope, Id. 484; The Niphon, Id. 10,277; The Akbar, 5 Fed. 456; and the very recent case of The C. P. Minch, 61 Fed. 511. In this case salvage was denied because, although the master and part of the crew had left the ship, it did not certainly appear that he intended to abandon her, and the voyage was in fact completed, and wages paid to the crew. In the case of The Dawn, Case No. 3,666, Judge Ware seemed to be of opinion that, in case of wreck, the seamen might have two distinct claims, one for wages and another for salvage: the wages to be paid exclusively from the proceeds of any materials belonging to the ship, and the salvage to be a charge against the general mass of the property saved.

[The act of June 7, 1872 (17 Stat. 268, § 30; Rev. St. § 4524), provides that the right to wages shall not be dependent on the earning of freight, "but in all cases of wreck or loss of vessel, proof that any seaman or apprentice has not exerted himself to the utmost to save the vessel, cargo, and stores, shall bar his claim."]